IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED

FEB 2 2 2013

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

CHRIS FULTON,                          )
     Plaintiff,                       )
                         )
                         )
        v.                              )     CIVIL NO. 3:12-cv-187(HEH)
                         )
MICHAEL J. ASTRUE,                     )
     Commissioner of Social Security,  )
     Defendant.                        )
_____)

## REPORT AND RECOMMENDATION

Chris Fulton ("Plaintiff") is 35 years old, an admitted alcoholic and worked as a telecommunications technician, wastewater treatment plant senior operator and railroad conductor. On June 9, 2009, Plaintiff applied for Social Security Disability ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act") with an alleged onset date of April 1, 2008, claiming disability due to major depressive disorder. Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's requests for benefits. The Appeals Council subsequently denied Plaintiff's request for review on January 11, 2012.

Plaintiff now challenges the ALJ's denial of benefits, asserting that substantial evidence did not support the ALJ's determination that Plaintiff's major depressive disorder failed to meet or equal listing § 12.04. (Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem.") at 5.) Plaintiff further contends that the ALJ did not apply a correct standard of law in assessing Plaintiff's credibility regarding his symptoms and that such a finding is not supported by substantial evidence. (Pl.'s Mem. at 5.) Finally, Plaintiff argues that the ALJ erred

in finding that Plaintiff could perform other work that existed in the national economy by failing to secure the opinion of a vocational expert on the issue. (Pl.'s Mem. at 5.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges whether substantial evidence supported the ALJ's determination that Plaintiff's mental disorder did not meet the listings, whether the ALJ properly considered Plaintiff's credibility, and whether the ALJ erred by failing to obtain vocational expert testimony. Therefore, Plaintiff's educational and work history, medical history, consulting physician's opinions, reported activities of daily living and the hearing testimony are summarized below.

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

A. Plaintiff's Education and Work History

Plaintiff has a high school diploma. (R. at 205.) Plaintiff received on-the-job training throughout his work history. (R. at 205.) Plaintiff worked for seven years as a technician in the telecommunications industry before taking another long-term job as a wastewater operator for Powhatan, earning his Wastewater Class III license. (R. at 200, 400.) Following his position as a wastewater operator, Plaintiff spent a few months working as a dispatcher for Goochland County. (R. at 49.) Plaintiff last worked as a railroad conductor, but left the job for non-medical reasons, indicating that he was "uncomfortable" and "did not feel safe" holding the "powerful position." (R. at 199–200.) Since being unemployed, Plaintiff started a small business dying yarn and selling it on the internet (R. at 400) and helped a woman take care of her pets for a few months. (R. at 48.)

B. Plaintiff's Medical History

Plaintiff visited Jennifer Mixson, M.S., on March 19, 2009 for a psychological consultation. (R. at 398.) Plaintiff was interested in receiving counseling and medication for depression arising from his separation from his wife the previous month. (R. at 398-404.) He spent his days watching television, knitting, visiting with friends and playing video games. (R. at 398.) Plaintiff was articulate, but had an anxious, depressed and withdrawn mood. (R. at 402.) Ms. Mixson also noted that Plaintiff's appearance and thought process appeared normal. (R. at 402.)

Plaintiff visited Padjama Caparala, M.D., on April 9, 2009 for a psychiatric consultation. (R. at 396.) Plaintiff had never been hospitalized for depression or suicide or followed by a psychiatrist. (R. at 396.) During the appointment, Plaintiff appeared logical and content. (R. at 397.) His cognitive functioning remained intact. (R. at 397.) Dr. Caparala prescribed

medication, diagnosed Plaintiff with major depression, assigned him with a Global Assessment of Functioning[2] ("GAF") of 50[3] and advised him to continue therapy. (R. at 397.) During an April 16, 2009 follow-up appointment, Dr. Caparala recommended hospitalization for Plaintiff. (R. at 411.)

On April 16, 2009, Ms. Mixson and Dr. Caparala recommended that Plaintiff be hospitalized due to suicidal ideations. (*See* R. at 405-412.) Plaintiff was admitted to St. Mary's Hospital on April 17, 2009. (R. at 337.) Plaintiff discussed a lack of motivation, weight loss and depression, but his eye contact, insight and reasoning remained intact and he demonstrated good sleep patterns. (R. at 337.) Plaintiff also suffered multiple panic attacks. (R. at 337.) During his hospitalization, Plaintiff interacted selectively with peers and appeared calm. (R. at 337-38.) Upon discharge on April 20, 2009, he was diagnosed with major depressive affective disorder. (R. at 337.)

Plaintiff was treated by Ms. Mixson on May 11, 2009. (R. at 440.) Plaintiff used healthy coping techniques by reading and participating in his church community. (R. at 440.) During his May 19, 2009 appointment, Plaintiff appeared depressed. (R. at 438.) During his May 22, 2009 meeting, Plaintiff focused on self-esteem and his affect brightened when recounting positive messages about his father. (R. at 437.) Patient notes on May 26, 2009 documented Plaintiff's progress with functioning alone and eliciting social support. (R. at 436.) During Plaintiff's telephone session with Ms. Mixson, Plaintiff advised that he drank alcohol after he got angry following a conversation with his wife and ex-wife. (R. at 435.) His "affect appeared

---

2      The Global Assessment of Functioning ("GAF") is a 100-point scale that rates "psychological, social, and occupational functioning." *Diagnostic Statistical Manual of Mental Disorders, Americ. Psych. Assoc.*, 32 (4th Ed. 2002) (hereinafter "DSM-IV").

3      A GAF of 41-50 is defined as "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsession rituals frequent shoplifting) OR any serious impairment in social, occupational or school functioning (*e.g.*, no friends, unable to keep a job)." DSM-IV at 34.

somewhat brighter," at the beginning of his June 2, 2009 appointment. (R. at 434.) Progress notes from June 4, 2009 indicated that Plaintiff sleeps five to six hours each night. (R. at 433.) On June 9, 2009, Plaintiff phoned Ms. Mixson and reported "extreme distress" after an argument with his wife. (R. at 432.) He had a therapy session later that same day during which he discussed boundaries and responsibility of his own actions. (R. at 432.) Plaintiff appeared "subdued, but not tearful" during his June 11, 2009 therapy session. (R. at 431.) Plaintiff failed to attend his appointment set for June 18, 2009. (R. at 429.)

During Plaintiff's June 23, 2009 and July 1, 2009 appointments, Plaintiff discussed his relationship with his wife. (R. at 427-28.) Plaintiff phoned Ms. Mixson on July 9, 2009 to refill his prescription and she affirmed his choice to defuse a fight with his wife. (R. at 426.) On July 13, Plaintiff discussed his ability to maintain relationships. (R. at 424.) Plaintiff failed to attend his appointment set for July 16, 2009. (R. at 423.)

During a quarterly review on July 22, 2009, Ms. Mixson documented that Plaintiff was consistently active in his treatment and that he was alert and oriented, but that he missed two recent appointments. (R. at 422.) His social strengths include that Plaintiff is "intelligent, friendly and interested in others." (R. at 422.) Plaintiff told Ms. Mixson about a recent visit to a friends' home to help repair their computer. (R. at 421.)

During his July 29, 2009 appointment, Ms. Mixson noted that Plaintiff was "somewhat subdued" and discussed his marital relationship. (R. at 420.) Plaintiff called Ms. Mixson on August 4, 2009 to report a fight that he had with his wife and ex-wife over a bottle of liquor. (R. at 419.) Plaintiff explained that while he did not have suicidal thoughts, his wife and ex-wife called the police after he made a potentially suicidal comment. (R. at 419.) The next day, Plaintiff attended an appointment with Dr. Mixson during which he admitted that he had engaged

in binge drinking for two days, which caused the argument with his wife and ex-wife. (R. at 512.)

On August 19, 2009, Plaintiff had an angry affect. (R. at 511.) Both his wife and ex-wife told him that he needed treatment for bipolar disorder. (R. at 511.) He reported that his medication was not working. (R. at 511.) During Plaintiff's appointment on August 26, 2009, Plaintiff indicated dissatisfaction with his current medication. (R. at 510.) Ms. Mixson held a telephone consultation with Plaintiff on August 31, 2009, in which Plaintiff reported "increased symptoms of depression." (R. at 509.) Plaintiff called to cancel his September 2, 2009 therapy session, because he was spending time with a friend. (R. at 508.) Patient notes from September 3, 2009 specified that Plaintiff had no difficulty sleeping and an "o.k." appetite. (R. at 507.) On September 8, 2009, Plaintiff was depressed and presented a constricted affect. (R. at 506.) Plaintiff exhibited fairly severe symptoms of depression during his September 21, 2009 appointment. (R. at 504.) He was profoundly depressed and exhibiting signs of a borderline personality disorder during his September 30, 2009 therapy appointment. (R. at 503.) On October 2, 2009, Plaintiff telephoned to report side effects from his medication that included an upset stomach and intense dreams. (R. at 502.) During his October 8, 2009 appointment, there was slight improvement, but Plaintiff was still depressed. (R. at 501.)

During his October 13, 2009 appointment, Plaintiff attributed his improved mood to the support that he received from his friends, indicating that he even made a new friend. (R. at 496.) During his quarterly review, Ms. Mixson indicated that Plaintiff was consistently active and had made "moderate/mixed" progress toward his goals. (R. at 497.) He maintained a sad affect and complained of "unremitting depression." (R. at 497.) Motivation was a major issue and Plaintiff struggled performing everyday tasks. (R. at 497.) Plaintiff missed doses of his medication. (R.

at 497.) Patient notes documented Plaintiff's problem with medication compliance during Plaintiff's October 19, 2009 appointment. (R. at 495.) He continued to have feelings of helplessness, hopelessness and worthlessness. (R. at 495.)

On November 5, 2009, Plaintiff's medications were increased to compensate for his anger arising from his wife obtaining a restraining order against him. (R. at 493-94.) During a telephone consultation the next day, Plaintiff indicated that he planned to visit Legal Aid to assist him in the restraining order matter. (R. at 491.) During his November 11, 2009 therapy session Plaintiff noted that he felt optimistic and received support from his friends in dealing with the legal issue. (R. at 489.) However, he felt upset and frustrated after indicating that his court appearance "had not gone well." (R. at 488.) On November 16, 2009, Plaintiff called Ms. Mixson to obtain more medicine, because he misjudged the amount over the weekend. (R. at 487.) Additionally, Plaintiff reported that he was working through his financial problems stemming from the separation, including missed payments on his wife's van and credit card purchases made on his card by his wife. (R. at 487.) He did not show for his scheduled November 19, 2009 appointment, but visited the clinic to obtain a refill of his medications. (R. at 485-86.) Plaintiff visited Ms. Mixson on November 24, 2009, reporting that he had more motivation and energy and decreased sadness. (R. at 484.)

On December 9, 2009, Plaintiff explained that his court date regarding child visitation went well and he had the ability to communicate effectively with the judge. (R. at 480.) During the December 15, 2009 appointment, Plaintiff stated that he helped a family with odd jobs and received offers to perform longer-lasting jobs. (R. at 479.) He also reported that he was depressed and felt victimized. (R. at 479.)

Plaintiff failed to report for his appointment scheduled for December 22, 2009. (R. at 478.) During his December 31, 2009 appointment, Plaintiff reported being lonely and feeling sad over the holidays. (R. at 475.) Plaintiff did not show for his scheduled appointment on January 6, 2010. (R. at 474.) During Plaintiff's quarterly review on January 13, 2010, Ms. Mixson opined that Plaintiff made progress toward his goals and believed that medication helped control his anger. (R. at 472.) He no longer felt that anger was a problem for him. (R. at 472.) Plaintiff missed his January 18, 2010 appointment; however, he attended his next appointment. (R. at 469-70.) Plaintiff volunteered for community service projects with the Red Cross. (R. at 469.) During his February 9, 2010 appointment, he discussed a friendship with a woman that he met online. (R. at 585.) Plaintiff did not appear for his February 18, 2010 appointment. (R. at 583). During a session on February 24, 2010, Plaintiff was in a good mood and Ms. Mixson characterized Plaintiff's relationship with his online friend as healthy. (R. at 582.)

During his March 12, 2010 therapy session, Plaintiff complained of the court order issued by a judge suspending his visitation with his child for failing to agree to home study and failing to attend an Alcoholic Anonymous ("AA") meeting. (R. at 580.) During the March 31, 2010 appointment, records indicated positive improvements in Plaintiff's mood. (R. at 578.) Plaintiff disclosed that his friend was moving into his home to provide some income. (R. at 578.)

Ms. Mixson completed an assessment on April 14, 2010, during which Plaintiff complained of depression, but stated that his life was better than before therapy. (R. at 573.) During his May 5, 2010 appointment, Plaintiff told Ms. Mixson that he attended an AA meeting and admitted to being an alcoholic. (R. at 571.) He skipped his May 12, 2010 therapy session. (R. at 570.) During his May 28, 2010 visit, Ms. Mixson noted the positive changes that Plaintiff had made. (R. at 569.) Plaintiff missed another session on June 25, 2010. (R. at 566.) He

attended another positive session on July 9, 2010, but failed to appear for his next scheduled appointments. (R. at 557, 563-64.)

Because of his missed appointments, Mr. Mixson spoke with Plaintiff during the August 26, 2010 review about his participation. (R. at 556.) However, Plaintiff was inactive during the session. (R. at 555.) He attended his therapy sessions in September and explained that he completed arts and crafts to earn a sense of accomplishment. (R. at 548.) Plaintiff reported having the ability to get things done at his October 21, 2010 session. (R. at 546.)

Plaintiff cancelled his appointments from October 27, 2010 until January 11, 2011, because his license was suspended. (R. at 545, 541-2.) During this time away from therapy, Plaintiff stopped taking Abilify, but asked for a refill on January 13, 2011. (R. at 539.) During the January 19, 2011 appointment, Plaintiff admitted that he was drinking alcohol and smoking marijuana regularly. (R. at 536.) He cancelled his next appointment scheduled for January 27, 2011. (R. at 534.) During Plaintiff's February 11, 2011 appointment, Plaintiff reported being only "slightly depressed," but indicated that he stopped taking some medications because he was drinking beer nightly. (R. at 530-33.)

During Plaintiff's quarterly review on February 16, 2012, Ms. Mixson noted that Plaintiff was intermittently involved in his treatment and that he was alert and oriented, but his mood was depressed. (R. at 527.) Ms. Mixson noted Plaintiff's noncompliance with treatment. (R. at 527.)

C.    Non-treating State Agency Psychologists' Opinions

On October 5, 2009, a non-treating state agency physiologist, Leslie Montgomery, Ph.D., A.B.P.P., reviewed Plaintiff's medical records. (R. at 64-76.) Dr. Montgomery concluded that Plaintiff possessed an affective disorder. (R. at 70.) She opined that Plaintiff met the criteria of

listing § 12.04(A), but that Plaintiff had only a moderate restriction with his activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and only one or two repeated episodes of decompensation, each of extended duration under § 12.04(B). (R. at 70.) Additionally, Plaintiff did not meet the requirements of § 12.04(C). (R. at 70.)

In assessing Plaintiff's RFC, Dr. Montgomery opined that Plaintiff had moderate limitations in his ability to understand and remember detailed instructions. (R. at 71.) He had sustained concentration and persistence limitations, including moderate limitations in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual, to work in coordination with others and to complete a normal workday and work week without interruptions from psychological symptoms. (R. at 72.) Plaintiff was also moderately limited in his ability to interact with the general public. (R. at 72.) Dr. Montgomery marked moderate limitations for Plaintiff's ability to respond appropriately to changes in a work setting and to set realistic goals or make plans independently of others. (R. at 73.)

Dr. Montgomery indicated that Plaintiff had no significant limitations in his ability to remember locations and work-like procedures, to understand and remember short, simple instructions, to carry out very short and simple instructions, to sustain an ordinary routine without special supervision and to make simple work-related decisions. (R. at 71-72.) Further, Dr. Montgomery opined that Plaintiff was not significantly limited in social interactions with his abilities to ask simple questions and request help, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them, to maintain socially appropriate behavior and to adhere to basic standards of

neatness and cleanliness. (R. at 72.) Ultimately, Dr. Montgomery noted that Plaintiff was limited to unskilled work. (R. at 74-75.)

On March 15, 2010, Alan Entin, Ph. D., A.B.P.P., a non-treating state agency psychologist, examined Plaintiff's medical records. (R. at 92-103.) Dr. Entin diagnosed Plaintiff with affective disorder and he opined that Plaintiff suffered a marked restriction of activities of daily living, marked difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two repeated episodes of decompensation of extended duration. (R. at 99.) Dr. Entin determined that Plaintiff was partially credible. (R. at 100.)

D.    Plaintiff's Activities of Daily Living

Plaintiff submitted two activities of daily living ("ADLs") reports dated August 11, 2009 (R. at 228-39) and February 13, 2010 (R. at 250-57). Plaintiff wrote in his August 2009 report that he used a note to remind himself to take medicine when he awoke. (R. at 229.) Plaintiff smoked and took his dog outside. (R. at 229.) He spent his day on the couch knitting and watching television. (R. at 229.) Plaintiff reported that before his alleged illness, he would pay his bills on time, take care of his personal hygiene, held a job, remembered to complete simple tasks and completed chores around the house. (R. at 230.)

Plaintiff reported that he was unable to sleep and would become so exhausted that he napped for a couple hours at a time. (R. at 230.) Therefore, he could not maintain a schedule. (R. at 230.) He claimed that he lacked personal hygiene and wore the same clothes for a week at a time. (R. at 230.) Plaintiff wrote that he rarely shaved or tended to his hair. (R. at 230.) He also complained of a lack of appetite and that he suffered from stomach problems causing

diarrhea and vomiting. (R. at 230.) His lack of memory required him to use sticky notes as reminders to return phone calls and take his medication. (R. at 231.)

Plaintiff acknowledged that he made easy dinners or frozen meals and that it usually took him about 30-45 minutes to prepare the food. (R. at 231.) He only laundered his clothes or mowed the lawn when necessary and often was reminded to perform chores. (R. at 231.) Plaintiff attributed his neglect of chores to his lack of motivation and low energy. (R. at 232.) He went outside daily to smoke and walked to his mailbox every few days. (R. at 232.) Plaintiff reported that he sometimes drove his car when he went out alone. (R. at 232.) He went grocery shopping about every other week for 30 minutes, but complained that he became anxious. (R. at 232.)

Plaintiff received no income and could not pay bills, handle his savings account or use a checkbook. (R. at 232-33.) He marked that he could count change. (R. at 232.) Plaintiff indicated that he knitted and played video games, but no longer hunted, cooked or went outdoors. (R. at 233.) He noted that he spent his time playing video games a few times a week. (R. at 233.) Plaintiff wrote that he attended church and counseling once a week and participated as much as possible. (R. at 233.)

Plaintiff marked that he had trouble getting along with others, including authority figures, and that he had a social circle. (R. at 234-35.) He noted difficulty concentrating for more than two minutes and felt frustrated following directions. (R. at 234.) He cited disagreements with his boss and a conflict as reasons for leaving past jobs. (R. at 235.)

In his February 2011 report, Plaintiff wrote that he slept on the couch and prayed for strength to get going for the day. (R. at 250.) He spent the rest of his day lying on the couch watching movies and sometimes played video games with a friend. (R. at 250.) Plaintiff made

dinner for himself and fed the dog. (R. at 250.) He read the Bible or watched television until he went to bed around 3 a.m. to 6 a.m. (R. at 250.) Plaintiff took his dog outside when he smoked. (R. at 251.) Before his alleged depression, Plaintiff indicated that he socialized with larger groups of friends, went out in public for extended periods of time, could remember things with ease and kept up with household chores. (R. at 251.) He marked that he barely slept, usually for only two hours at a time. (R. at 251.)

Plaintiff wore the same clothes for days in a row and changed them only if he vomited on them or went to the counselor or church. (R. at 251.) He indicated that he bathed before church or therapy, but rarely shaved. (R. at 251.) While he noted that he had no problem using the toilet or feeding himself, he often needed encouragement to leave the house. (R. at 251.) Plaintiff wrote that he did not need a reminder to take care of his personal needs and grooming, but that he used a pill box to keep track of his medications. (R. at 252.)

For meals, Plaintiff prepared frozen dinners or hot dogs daily and ate cheese and crackers. (R. at 252.) Before his alleged depression, Plaintiff enjoyed cooking more complex recipes. (R. at 252.) Plaintiff sometimes needed a reminded to launder his clothes; he did not iron or fold. (R. at 252.) He mowed the grass, but did not like having to go out to get gas for his lawnmower. (R. at 252.) Plaintiff went outside for 10 minutes about three to six times a day to smoke. (R. at 253.) Although he marked that he could drive, Plaintiff did not like leaving the house alone. (R. at 253.) Plaintiff explained that he went to the store two to three times a month for quick trips to buy food. (R. at 253.) He marked that he could count change, handle a savings account and use checks, but that he could not pay his bills due to a lack of income. (R. at 253.)

Plaintiff listed that he read, watched television and knitted "daily and well." (R. at 254.) However, he indicated that before his alleged condition, he knitted more often and watched less

television. (R. at 254.) Plaintiff noted that he talked on the phone and a friend came over to play video games about every other day. (R. at 254.) He attended church and Bible study regularly without a reminder. (R. at 254.) Plaintiff marked that he encountered no problems interacting with family and friends, but that he only went out when he could avoid people that he knew. (R. at 255.) He also marked that his depression affected his memory, concentration, understanding, use of his hands, ability to complete tasks, and his ability to following directions. (R. at 255.) Plaintiff acknowledged that he experienced no problems when he walked. (R. at 255.) While he finished conversations, he did not always finish his chores and could not follow written or spoken instructions. (R. at 255.)

Plaintiff wrote that he became nervous around authority figures, but maintained a polite demeanor. (R. at 256.) He lost his job at CSX, because he felt like he could not get help and that "they made [him] feel stupid." (R. at 256.) Plaintiff did not handle stress or changes in his routine well. (R. at 256.) He noted that he feared going out in public or being around too many people at once. (R. at 256.) Plaintiff listed glasses as the only physical aid that he used. (R. at 256.)

E.    Third Party Function Report

On August 3, 2009, Plaintiff's neighbor and friend, John Madding, completed a third party function report. (R. at 207-18.) Mr. Madding reported that he knew Plaintiff for seven years and that they saw each other one to two times a week. (R. at 208.) He noted that he did not know how Plaintiff spent his days, but that Plaintiff spent his time alone unless his friends or wife visited. (R. at 209.) Plaintiff took care of his dog, but his estranged wife supplied the dog's food. (R. at 209.) Mr. Madding was unsure of Plaintiff's skill level, but wrote that Plaintiff no longer worked at CSX because of his alleged disability. (R. at 210.) He noted that he heard

14

from Plaintiff's wife, ex-wife, friend and Plaintiff that Plaintiff had difficulty sleeping because of his depression. (R. at 210.)

Mr. Madding also reported that Plaintiff lost around 20-30 pounds. (R. at 210.) Plaintiff cooked simple meals for himself when he was hungry. (R. at 211.) Plaintiff ate full meals when he visited Mr. Madding's home. (R. at 211.) Mr. Madding reminded Plaintiff of the importance of taking his medications as directed, but Plaintiff feared growing dependent on his medications. (R. at 211.) While Mr. Madding believed that Plaintiff could complete chores, he noticed that Plaintiff failed to do any housework until necessary. (R. at 211.) Mr. Madding encouraged Plaintiff to mow the lawn and reminded him about yard work. (R. at 212.)

According to Mr. Madding, Plaintiff went out alone, drove himself and shopped for food. (R. at 212-13.) Mr. Madding marked that Plaintiff could not pay bills or manage a savings or checking account due to his lack of funds. (R. at 213.) He stated that Plaintiff watched television or attended Bible study as hobbies. (R. at 213.) Plaintiff never went out with other people. (R. at 213.) Mr. Madding indicated that Plaintiff interacted with his estranged wife daily, mostly by telephone, and such conversations usually ended in an argument. (R. at 214-15.) Plaintiff failed to handle stress well and "balled up" and cried after he argued with his wife. (R. at 216.) Mr. Madding acknowledged Plaintiff's difficulty in getting along with others, including his wife. (R. at 214-15.) Further, Plaintiff left his job at CSX, but Mr. Madding did not believe that this was due to Plaintiff's ability to get along with others. (R. at 214-15.)

Mr. Madding wrote that Plaintiff attended church and doctor's appointments without reminders. (R. at 214.) He noted that Plaintiff never showed difficulty concentrating during conversations. (R. at 215.) Plaintiff exhibited a fear of his wife leaving him for good. (R. at

216.) Mr. Madding finally noted that Plaintiff had "good days and bad days" and "[o]n good days, [Mr. Madding] would never guess what [he] saw on the bad days." (R. at 217.)

F.      Plaintiff's Testimony

Plaintiff testified on January 12, 2011 that he lived with his roommate. (R. at 45.) Plaintiff received food stamps. (R. at 46.) Plaintiff also volunteered a few times a month doing repairs at his church and setting up for church functions. (R. at 48-49.) Plaintiff drove to church and counseling about twice a week. (R. at 46-47.) He stated that his roommate would usually drive when they went shopping together. (R. at 47.) Plaintiff went to jail for four days and had his license suspended due to his failure to pay child support. (R. at 53, 58.)

Plaintiff agreed that he suffered no physical disability, only mental issues. (R. at 50-52.) He testified that he could use a telephone and computer, but did not use his computer at home. (R. at 51.) Plaintiff prepared easy meals and was occasionally helped by his roommate. (R. at 52.) He admitted that he occasionally completed chores around his house, but did not perform any yard work or gardening. (R. at 52-53.) Plaintiff stated that he maintained no hobbies since his disability began, but kept a routine of going to church. (R. at 53.) Sometimes his friends visited, but Plaintiff did leave the house. (R. at 54.) Plaintiff possessed the ability to maintain personal hygiene, but neglected such tasks. (R. at 53.) His medications included Selexa, Lemectol, Abilify and Larazapan. (R. at 54.) Plaintiff believed that the medications helped with his illness, but the side effects included vomiting and sleepiness. (R. at 54-55.) He reported these symptoms to his doctors. (R. at 55.) Plaintiff explained that he was prescribed Trazadone for sleeping, but he was not taking it. (R. at 56.) He typically slept four to six hours a night and took daily naps for one to three hours per day. (R. at 52.)

Plaintiff explained that he was hospitalized once for four days since April 1, 2008. (R. 56-57.) Plaintiff attended therapy since March 2009. (R. at 58.) He reported difficulties breathing that he attributed to his asthma and weekly panic attacks. (R. at 59.) At the onset of his panic attacks, Plaintiff took Larazapan and usually fell asleep within 40 minutes. (R. at 59.) He reported that he smoked roughly a half of a pack of cigarettes a day and drank about 12 beers per week. (R. at 59-60.) Plaintiff admitted to monthly marijuana use and used as recently as a week before the hearing. (R. at 60.) Plaintiff's estranged wife obtained a protective order against him in Goochland County Circuit Court. (R. at 61.) If he had more money, Plaintiff would seek greater psychiatric care. (R. at 61-62.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB and SSI on June 9, 2009, claiming disability due to major depressive disorder with an alleged onset date of April 1, 2008. (R. at 155-61, 162-68.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[4] (R. at 118-23, 126-131.) On January 12, 2011, Plaintiff had a hearing before an ALJ. (R. at 38.) On April 25, 2011, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 20.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on January 11, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (*See* R. at 1-6.)

---

[4]     Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

## III. QUESTIONS PRESENTED

Did substantial evidence exist to support the Commissioner's determination that Plaintiff did not meet or equal listing § 12.04?

Was the Commissioner's assessment of Plaintiff's credibility supported by substantial evidence on the record and determined by the application of the correct legal standard?

Was the Commissioner's determination that Plaintiff could perform other work that existed in the national economy supported by substantial evidence, despite the lack of testimony from a vocational expert?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citations and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts

from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[5] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of

---

[5]     SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

impairments which significantly limit[s] his physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[6] based on an assessment of the claimant's residual functional capacity ("RFC")[7] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

---

[6] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[7] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since April 1, 2008, the alleged onset date of his disability. (R. at 22.) At step two, the ALJ determined that Plaintiff was severely impaired from major depressive disorder. (R. at 22-23.) At step three, the ALJ concluded that, while the Plaintiff suffered from severe major depressive disorder, the severity did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 23-25.)

While the ALJ found that Plaintiff's conditions satisfied the requirements of a depressive disorder under § 12.04(A), he determined that Plaintiff failed to meet the criteria of § 12.04(B) &

(C). (R. at 23, 25.) The ALJ assessed that Plaintiff only had moderate restrictions with his ADLs, social functioning, concentration, persistence and pace, instead of marked limitations required to satisfy § 12.04(B). (R. at 24.) Plaintiff experienced two episodes of decompensation for an extended period of time and Plaintiff failed to meet the requirements set forth in § 12.04(C). (R. at 24.)

The ALJ then assessed that Plaintiff had the RFC to perform work at all exertional levels, subject to the nonexertional limitations of simple, unskilled work with limited interaction with the general public. (R. at 25.) The ALJ summarized Plaintiff's statements, which included that he stopped working due to his medical condition, but reported no problems standing, walking, sitting, writing, using the telephone or driving. (R. at 26.) Plaintiff indicated that he slept four to six hours each night and took naps for one to three hours daily. (R. at 26.) Plaintiff spent his days shopping with his roommate, cooking simple meals and sometimes performing chores around his home. (R. at 26.) However, Plaintiff did not have any hobbies or perform yard work. (R. at 26.) While Plaintiff contended that he could tend to his personal needs, Plaintiff failed to do so. (R. at 26.) Plaintiff stated that he vomited about two to four times a day. (R. at 26.) Plaintiff took medication for his depression and insomnia, but his medications caused drowsiness. (R. at 26.) Plaintiff stopped taking Trazadone, a sleep medication, because he worried about becoming dependent on it. (R. at 26.)

Plaintiff has been taking medication for depression since age 18, but sometimes forgot to take his medications or chose not to take them due to their side effects. (R. at 26.) Plaintiff testified on the day of the hearing that he did not take his medication, so that he would not feel groggy. (R. at 26.) Since the alleged onset date of his disability, Plaintiff stated that he was hospitalized one time for a period of four days. (R. at 26.) Plaintiff attended counseling sessions

regularly and stated that counseling was helpful. (R. at 26.) Plaintiff testified that he drove about twice a week to church or counseling appointments, but others drove him to the grocery store. (R. at 26.) He suffered from panic attacks and shortness of breath once a week. (R. at 26.) While Plaintiff testified that he had not worked since his alleged onset of his disability, he helped a woman care for her pets for a few months and volunteered setting up for events at his church a couple of times a month. (R. at 26.) The ALJ determined that Plaintiff's medical condition could reasonably cause the symptoms that Plaintiff alleged, but that the intensity, persistence and limiting effect of the symptoms lack creditability in light of the RFC assessment. (R. at 26.)

The ALJ noted Plaintiff's lack of full compliance with his treatment program, missing appointments and refusing to take medication. (R. at 26.) Plaintiff's treatment under Dr. Mixson required three therapy appointments per month. (R. at 26.) However, because of Plaintiff's failure to comply with his prescribed medication and missed appointments, treatment was changed to require only two appointments per month. (R. at 26.) The ALJ indicated doubt as to Plaintiff's credibility regarding the extent of the alleged disability. (R. at 27.)

Further, the ALJ examined Plaintiff's ADLs. (R. at 27.) Plaintiff helped friends fix their computer, worked on arts and crafts projects, knitted, played video games and started an internet business. (R. at 27.) He also drove twice a week to church and therapy, helped a woman care for her pets, volunteered at church a few times a month, attended church weekly and attended Bible study with a neighbor. (R. at 27.) Plaintiff could prepare meals, perform household chores, mow the lawn and launder clothes when necessary. (R. at 27.) The ALJ determined that these activities were inconsistent with the alleged extent of Plaintiff's disability. (R. at 27.)

In examining the medical evidence, the ALJ noted inconsistency with Plaintiff's alleged extent of his disability. (R. at 27.) While Plaintiff alleged an onset date of April 2008, he did not seek therapy until after his hospitalization one year later. (R. at 27.) In May 2009, Plaintiff indicated that his treatment plan seemed to help. (R. at 27.) One month later he made progress and in January 2010, Ms. Mixson's notes indicated that therapy and medication were working. (R. at 27.) Ms. Mixson attributed any problem in Plaintiff's illness to Plaintiff's failure to fully comply with treatment and missed appointments. (R. at 27.)

While the ALJ indicated that treating psychologist's opinions could be assigned controlling weight, the ALJ noted that Plaintiff's psychologist offered no opinion as to Plaintiff's work restrictions that arose from Plaintiff's mental issues. (R. at 27.) Treatment records documented a GAF of 50 during Plaintiff's initial evaluation in April 2009. (R. at 27.) However, the assessment was not based upon long-term treatment and occurred before Plaintiff was hospitalized or began out-patient therapy. (R. at 27-28.) An assignment of a GAF of 29 took place before Plaintiff's hospitalization in April 2007. (R. at 28.) The ALJ noted that it appeared as if Plaintiff's condition improved. (R. at 28.) Therefore, the ALJ applied little weight to such evidence. (R. at 28.)

The ALJ concurred with and adopted the opinions of the non-treating state agency psychological consultants who opined that Plaintiff had moderate limitations in the ability to understand, remember and carry out detailed job instructions, but no significant limitations with simple job instructions and no limitations on making simple judgments about work-related topics. (R. at 28.) The non-treating state agency psychological consultants' opinions noted that moderate restrictions existed with Plaintiff's ability to interact with the general public, but no

such limitation existed with Plaintiff's ability to interact with co-workers and supervisors. (R. at 28.) The ALJ determined that the opinions were consistent with the records. (R. at 28.)

The ALJ next considered the Third Party Function Report from Mr. Madding that was submitted in August 2009. (R. at 28.) Mr. Madding wrote that he interacted with Plaintiff a couple times a week and that they attended Bible study together. (R. at 28.) He also noted that he worried that Plaintiff was not eating, though Plaintiff appeared to be eating more lately. (R. at 28). Mr. Madding noted that he saw Plaintiff prepare meals for himself, but Plaintiff usually only ate full meals when he visited Mr. Madding's house for dinner. (R. at 28.) Sometimes, Mr. Madding reminded Plaintiff to take his medication, but Plaintiff feared becoming addicted to them. (R. at 28.) Plaintiff took care of his wife's dog, but she supplied the food. (R. at 28.) Mr. Madding agreed that Plaintiff seemed capable of completing chores, though they were often neglected. (R. at 28.) While Mr. Madding explained that Plaintiff could not pay his bills, he explained that Plaintiff had the mental capacity to do so, but not the funds. (R. at 28.) Mr. Madding noted that Plaintiff could get along with others, but had difficulty getting along with his wife. (R. at 28.) Plaintiff did not need reminders to go places and had no difficulty paying attention. (R. at 28.) The ALJ found that this evidence only partially corroborated the subjective extent of Plaintiff's alleged disability. (R. at 29.)

At step four, the ALJ assessed that Plaintiff could not perform his past relevant work. (R. at 29.) At step five, the ALJ considered Plaintiff's age, marginal education, ability to communicate in English, work experience and RFC and determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 30.) In making the determination, the ALJ used the Grids pursuant to 20 C.F.R. pt. 404, sub P, app. 2,

§ 204.00. (R. at 30.) The ALJ therefore found that Plaintiff had not been under a disability under the Act from April 1, 2008. (R. at 30.)

Plaintiff asserts that substantial evidence did not support the finding that his major depressive disorder failed to meet or equal listing § 12.04. (Pl.'s Mem 5.) Specifically, Plaintiff argues that the ALJ erred in determining that Plaintiff did not suffer a marked impairment in his ADLs, social function and ability to maintain concentration, persistence or pace, and failed to find that Plaintiff had repeated terms of decompensation. (Pl.'s Mem. at 9-10.) Plaintiff also contends that the ALJ failed to apply the correct standard of law in assessing Plaintiff's credibility. (Pl's Mem. at 5.) Finally, Plaintiff asserts that the ALJ failed to meet his burden at step five, as he failed to obtain the testimony of a vocational expert. (Pl.'s Mem. at 5.)

Conversely, Defendant argues that substantial evidence supported a finding that Plaintiff's major depressive disorder failed to meet or equal listing § 12.04. (Defendant's Brief in Support of Summary Judgment ("Def.'s Mem.") at 18-22.) Defendant also asserts that the ALJ applied the correct standard of law with respect to Plaintiff's credibility. (Def.'s Mem. at 22-27.) Finally, Defendant maintains that the ALJ did not err at step five by not obtaining vocational expert testimony. (Def.'s Mem. at 27-30.)

A.    The ALJ did not err when he assessed Plaintiff's credibility.

Plaintiff argues that the ALJ applied the incorrect standard of law in determining Plaintiff's credibility. (Pl.'s Mem. at 13-14.) In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Craig*, 76 F.3d at 594; SSR 96-7p, at 1-

3. In doing so, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13.

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the Plaintiff's impairments and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms. The ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

The ALJ considered all evidence regarding Plaintiff's symptoms in compliance with SSR 96-7p, including Plaintiff's medical records, Plaintiff's testimony, third party functioning reports and Plaintiff's ADLs. (R. at 26-28.) The ALJ determined that Plaintiff's underlying depression could reasonably produce his alleged symptoms. (R at 26.) However, the ALJ did not find Plaintiff's statements concerning the severity and limiting effect of his condition credible to the extent that they contradicted Plaintiff's ability to perform sedentary work. (R at 26.) While Plaintiff takes umbrage with the ALJ's boilerplate language, (*see* Pl.'s Mem. at 13-14), as long as substantial evidence supported the conclusion, this Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997).

Objective medical evidence supported the ALJ's finding. Plaintiff's therapy evidence was generally unremarkable. At various times, Ms. Mixson's records indicated that Plaintiff's mood improved and that treatment and medication were helping his depression. (R. at 472, 476, 496, 548.) She noted that Plaintiff made a new friend that he met online and spent time visiting friends and fixed their computer. (R. at 585.) Multiple progress notes throughout Plaintiff's

treatment addressed his interest and sensitivity toward others. (R. at 422, 469, 497.) Plaintiff told Ms. Mixson that he worked to resolve unpaid bills. (R. at 484, 487.) He completed crafts and felt a sense of accomplishment. (R. at 548.) Patient notes documented Plaintiff's progress. (R. at 422, 472.) Further, medical records reflected that Plaintiff failed to comply completely with his treatment, missed appointments and skipped doses of medication. (R. at 423, 429, 470, 478, 527, 540, 545, 563, 566, 572, 575, 583.) Due to this non-compliance with treatment, the ALJ assessed a lack of credibility in Plaintiff's allegation of constant depression. (R. at 26-27.)

This, however, was not the only substantial evidence to support the ALJ's finding. The Third Party Functioning Report completed by Mr. Madding also supported the ALJ's decision. Mr. Madding indicated that Plaintiff could complete household chores and prepare meals. (R. at 211-12.) Although Plaintiff appeared to be losing weight, Mr. Madding noted that his appetite improved. (R. at 210-11.) Mr. Madding and Plaintiff attended bible study together on a regular basis, but Plaintiff also drove alone and shopped for food. (R. at 212-13.) Mr. Madding's report indicated that Plaintiff attended church twice a week and attended doctors' appointments, both without reminders. (R. at 214.) Further, Plaintiff could get along with others, except for his wife. (R. at 214-15.) Plaintiff could concentrate during conversations between Plaintiff and Mr. Madding. (R. at 215.)

Plaintiff's ADLs further supported the ALJ's decision. Plaintiff fed and cared for his dog. (R. at 229, 251.) He had difficulty sleeping due to anxiety and spent most of his day watching television on his couch. (R. at 229, 250.) Plaintiff could prepare simple meals for himself when he was hungry. (R. at 231, 252.) He knitted, read the Bible and played video games when friends visited. (R. at 229, 254.) He also stated that he could launder his clothing

and perform other chores, but only when necessary. (R. at 231, 252.) Plaintiff drove himself to church and therapy and went shopping for food when necessary. (R. at 232-33, 254.)

Finally, Plaintiff's testimony supported the ALJ's finding. During the administrative hearing, Plaintiff testified that he completed high school, but received no special training other than that received on the job. (R. at 45-46.) Since the alleged onset of his disability, Plaintiff took care of animals of another person for about two months and volunteered a few times a month at his church. (R. at 46-49.) Plaintiff drove twice a week to church and counseling. (R. at 47.) He suffered no psychical disability, only mental issues. (R. at 49-50.) Plaintiff explained that he was prescribed Trazadone for sleep, but stopped taking it because of the drowsiness that he experienced. (R. at 51, 56.) He typically slept four to six hours a night and napped daily. (R. at 52.) He took Selexa, Lemectol, Abilify and Larazapan and reported that he believed the medications helped his illness. (R. at 54.) Plaintiff prepared meals for himself, admitted that he could occasionally perform chores around his house and went to church weekly. (R. at 52-53.) Plaintiff visited with friends occasionally. (R. at 54.) He could tend to his personal hygiene, but often neglected such tasks. (R. at 53.) Plaintiff was hospitalized once for four days in April 1, 2008. (R. 56-57.) Plaintiff attended therapy since March 2009. (R. at 58.) He reported weekly panic attacks, but Plaintiff took Larazapan at the onset to cope with his condition. (R. at 59.)

As demonstrated above, Plaintiff's medical records, Plaintiff's testimony, third party functioning reports and Plaintiff's ADLs support a finding that Plaintiff's underlying depression could reasonably produce his alleged symptoms. However, Plaintiff's statements concerning the severity and limiting effect of his condition lacked credibility to the extent that Plaintiff's statements contradicted his ability to perform sedentary work. Plaintiff's ability to perform sedentary work was supported by his medical records, his testimony, third party functioning

reports and Plaintiff's ADLs. Therefore, because substantial evidence supported his credibility assessment, the ALJ did not err.

B. Substantial evidence supported a finding that Plaintiff's impairments failed to meet or equal listing § 12.04.

Plaintiff has the burden of proving that he meets or equals a listing. *Yuckert,* 482 U.S. at 146 n.5. The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley,* 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530.

Plaintiff challenges the ALJ's determination that he did not meet or equal listing § 12.04, which reads:

> Affective disorders: Characterized by a disturbance of mood, accompanied by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically or documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
>
>    a. Anhedonia or pervasive loss of interest in almost all activities; or
>    b. Appetite disturbance with change in weight; or
>    c. Sleep disturbance; or
>    d. Psychomotor agitation or retardation; or
>    e. Decreased energy; or
>    f. Feeling of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or
h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking . . .

. . . and

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt.404, subpt P, app. 1, § 12.04.

The degree of impairment for each category is measured on a five-point scale using the designations: "None, Mild, Moderate, Marked and Extreme." 20 C.F.R. § 404.1520a(c)(4). A marked impairment is defined loosely as "more than moderate but less than extreme" and "arises when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt 404, subpt P, app. 1, § 12.00 (c).

Repeated periods of decompensation is measured on a four-point scale using the designation "[n]one, one or two, three and four or more." 20 C.F.R. § 404.1520a(c)(4). Repeated periods of decompensation, each for extended durations, requires "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. pt 404, subpt P, app. 1, § 12.00(c)(4). "If [Plaintiff] experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, [the ALJ] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id.*

While the ALJ found that Plaintiff's major depressive disorder met the requirements of listing §12.04(A), the ALJ determined that Plaintiff's major depressive disorder failed to meet the standards under listing § 12.04(B). (R. at 23-24.) Integral to this conclusion was the ALJ's finding that Plaintiff had moderate difficulties in social functioning, moderate restrictions with his ADLs, moderate restrictions on concentration, persistence and pace, and two episodes of decompensation. (R. at 24.)

Plaintiff argues that the ALJ's determination that Plaintiff suffered only moderate impairments failed to take into consideration Dr. Entin's opinion that Plaintiff suffered marked impairments in his ADLs and social functioning. (Pl.'s Mem. at 10-11, n.3.) Plaintiff contends that because Dr. Entin's opinion was not refuted, it should have been given greater deference. (Pl.'s Mem. at 11.)

The ALJ must consider all evidence in the record. 20 C.F.R. §404.1527(e)(2)(i). Here, the ALJ considered Dr. Entin's opinion and found that it was entitled to limited weight due to inconsistencies with other substantial evidence. (R. at 24.) The ALJ found that the evidence suggests "less than marked functional limitations in activities of daily living and social functioning." (R. at 24.) Specifically, the ALJ points to Dr. Montgomery's findings as being inconsistent with Dr. Entin's opinion. (R. at 24.) As the fact finder, the ALJ was permitted to rely on the opinion that he found more persuasive. 20 C.F.R. §404.1527(e)(2)(i).

Further, Plaintiff argues that the ALJ incorrectly calculated the number of decompensations that Plaintiff suffered. (Pl.'s Mem. at 12-13, n.6.) For example, Plaintiff argues that the ALJ failed to consider Plaintiff's hospitalization. (Pl.'s Mem. at 12-13, n.6.) Plaintiff was hospitalized in April 2009 for four days, but this incident did not meet the extended

duration requirement of two weeks. 20 C.F.R. pt 404, subpt P, app. 1, § 12.00(c)(4). Therefore, the ALJ correctly analyzed Plaintiff's decompensations.

Considering all of the evidence, the ALJ concluded that Plaintiff's testimony, medical examinations and reported activities were inconsistent with a mental impairment that precluded work-related activity. (R. at 25.) As such, the ALJ resolved credibility determinations against Plaintiff, which was not improper. Consequently, substantial evidence existed to support the ALJ's conclusion that Plaintiff failed to meet the requirements of listing § 12.04.

C.    The ALJ did not err in relying upon the Medical Vocational Guidelines.

Plaintiff argues that the ALJ failed to obtain Vocational Expert ("VE") testimony to support the finding that substantial jobs exist in the national economy when Plaintiff was limited to work that required only occasional interaction with the general public. (Pl.'s Mem. at 19-20.) Relatedly, Plaintiff argues that the evidence does not support that limitation. (Pl.'s Mem. at 22, n.13.) Defendant maintains that the ALJ's reliance on the Grids without a VE is proper where Plaintiff suffers from solely nonexertional limitations that limit Plaintiff to unskilled work with only occasional interaction to the public, because the Grids determined that substantial work exists in the national economy regardless of those limitations. (Def.'s Mem. at 29.)

Once an ALJ determines a claimant's RFC, he may use the Medical Vocational Guidelines ("Grids") to determine the claimant's level of disability and potential for employment. Utilization of the Grids is predicated on the claimant suffering from exertional limitations. 20 C.F.R. § 404.1569a; *see* 20 C.F.R.Pt. 404, Subpt. P, App. 2, Table 1, § 200.01(e)(1) ("The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments").

When a claimant suffers from solely nonexertional limitations, the Grids are not conclusive and may be used only as a guide. *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983). It is important to note, however, that "not every nonexertional limitation or malady *rises to the level of a nonexertional impairment, so as to preclude reliance on the grids.*" *Walker*, 889 F.2d at 49 (citing *Grant*, 699 F.2d at 191-92). The ALJ must inquire whether the nonexertional condition affects the claimant's RFC to perform work of which the claimant is exertionally capable. *Id.* "[I]f the claimant's nonexertional impairments limit the range of jobs available to a person with the claimant's exertional capabilities, then the Commissioner must produce a vocational expert to testify that the particular claimant retains the ability to perform specific jobs which exist in the national economy." *Adkins v. Astrue*, 2011 WL 652508, at * 3 (E.D. Va. Feb. 10, 2011) (quoting *Grant*, 699 F.2d at 191-92) (internal quotations omitted).

Here, the ALJ determined that Plaintiff could perform work at any exertional level. (R. at 25.) Plaintiff is limited by nonexertional limitations including "simple, unskilled work involving only occasional interaction with the general public." (R. at 25.) He possesses sufficient mental capacity to perform competitive, remunerative, unskilled work. (R. at 25.) The ALJ noted that Plaintiff maintains the ability to understand, remember, and carry out simple instructions, use judgments to make simple, work-related decisions, respond appropriately to supervision, coworkers and work situations, and could deal with changes in a work setting under SSR 96-9p. (R. at 25.) The ALJ determined that the nonexertional limitations had no effect on Plaintiff's occupational base and, therefore, used section 204.00 of the Grids as the framework for determining that Plaintiff was not disabled. (R. at 30.)

The "mental activities . . . generally required by competitive, enumerative, unskilled work" include "understanding, remembering, and carrying out simple instructions, making

judgments that are commensurate with the functions of unskilled work — i.e., simple work-related decisions, responding appropriately to supervision, co-workers and usual work situations, dealing with changes in a routine work setting." SSR 96-9. Unskilled jobs provide substantial vocational opportunities for persons with solely mental limitations who maintain the ability to meet the mental activities required of unskilled work. SSR 85-15. Specifically, "[u]nskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people." SSR 85-15. Therefore, when a claimant is limited to positions that require little contact with the public, the limitation has little effect on Plaintiff's occupational base of unskilled work at all exertional levels, and VE testimony is not necessary. *Adkins*, 2011 WL 652508, at *3; *Bolland v. Astrue*, 2009 WL 2431536, at *7; *see also Cheeks v. Astrue*, 2010 WL 2653649, at *5 (E.D. Va. June 3, 2010) (finding no VE testimony necessary when Plaintiff suffered nonexertional limitations requiring her to perform unskilled work with limited interaction with the public).

Substantial medical evidence in this case supports the ALJ's finding that Plaintiff maintained the mental capacity to perform unskilled work and maintain limited interactions with the general public. Dr. Montgomery indicated that Plaintiff had no significant limitations in his ability to remember locations and work-like procedures, to understand and remember short, simple instructions, to carry out very short and simple instructions, to sustain an ordinary routine without special supervision and to make simple work-related decisions. (R. at 71-72.) Further, Dr. Montgomery opined that Plaintiff was not significantly limited in social interactions with his abilities to ask simple questions and request help, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without

distracting them, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 72.) Ultimately, Dr. Montgomery noted that Plaintiff was limited to unskilled work. (R. at 74-75.)

Plaintiff himself acknowledged that he could perform the mental activities required under SSR 96-9p. Plaintiff admitted that does well with simple written instructions. (R. at 255.) He also indicated that he has no problems getting along with family, friends, neighbors and others. (R. at 255.) He further stated that he is polite towards authority figures. (R. at 256.) Plaintiff noted that he spends time with his friends talking and playing video games. (R. at 233, 250, 254.) These facts provide substantial evidence in support of the ALJ's finding that Plaintiff possesses the ability to perform unskilled work and could maintain limited interaction with the public.

As detailed above, substantial evidence supports Plaintiff's ability to perform unskilled work at all exertional levels. The ability to perform unskilled work at all exertional levels creates substantial vocational opportunities. SSR 85-15. Plaintiff's limitation to work involving only occasional interaction with the public did not erode Plaintiff's occupational base, because unskilled work typically does not involve work with the public. SSR 85-15. Therefore, VE testimony was not necessary for the ALJ to make the finding that jobs existed in the national economy, and the ALJ properly relied on the Grids. *See Adkins*, 2011 WL 652508, at *4 ("[W]here a claimant's 'nonexertional limitations have a minimal effect on his exertional occupational base, then a finding directed by the Grids is sufficient, and testimony by a VE is unnecessary.'") (quoting *Boland*, 2009 WL 2431536, at *7).

## VI. CONCLUSION

For the reasons set forth herein, it is the Court's recommendation that Plaintiff's motion for summary judgment (ECF No. 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Henry E. Hudson and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/ _____

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated: February 22, 2013